**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ANGELA KENDALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:22-cv-01119- JAR |
| | ) |
| ZOLTEK CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's motion for summary judgment in this employment discrimination case.  Finding the evidence in the record insufficient to raise any genuine issue of disputed material fact to support a verdict for Plaintiff, the Court will grant the motion.

**BACKGROUND**

The facts are largely uncontroverted.  Defendant Zoltek Corporation manufactures products for a division of the U.S. Department of Homeland Security.  Its facility in St. Peters, Missouri, supplies wind turbine generators for renewable energy.  Plaintiff Angela Kendall was hired as a Production Operator in December 2018. Zoltek's written job description for this role calls for 12-hour shifts operating machinery to process carbon fiber, batch mixing resin/polymer, continuously feeding fiber into machines, inspecting product during and after production, and restocking materials. (Doc. 48-1). The position requires employees to be able to lift 25 pounds overhead; stand for extended periods of time (up to 12 hours); and lift, turn, bend, reach, pull, and walk. (Doc. 48-1).

1

On April 27, 2021, Kendall was performing her usual job duties when she slipped in a puddle and injured her back. (Doc. 48-5). She returned to work the following evening but left early due to her back pain. Three days later, she sought emergency care and was diagnosed with spasms and potential sciatica. The next week, on May 7, she visited a Concentra doctor and was released back to work with no restrictions. (Doc. 48-6).

Six weeks later, in late June 2021, Kendall followed up with her primary physician, Dr. Doris Brown, and received a doctor's note stating, "Please allow Angela sitting time secondarily, during her work shifts due to her sciatica flare ups." (Doc. 48-7). In compliance with this note, Kendall's supervisor, Harold Webster, and foreperson, Michelle Williams, allowed Kendall to sit during her shifts. Zoltek accommodated Kendall's restriction this way for nearly three months, but her condition did not improve.

In mid-September, a Zoltek human resources (HR) specialist, Dianna Young, asked Kendall to provide further documentation regarding her medical restrictions. (Doc. 48-8). Kendall provided a note from Nurse Practitioner Elizabeth King stating, "Patient may return to work with the following restrictions: Above patient cannot crawl up under something and get back up after to return to sitting down position as they would like her to. (pt. can sit down to work just not crawl)." (Doc. 48-9).

On October 1, Kendall submitted a Process Events report stating that foreperson Williams was harassing her and creating a hostile work environment due to her work restrictions. (Doc. 48-10). Kendall stated in deposition that Williams "started moving me around to different machines" and told Kendall's coworkers not to help her. (Doc. 48-2 at 45-50). In addition, Williams told Kendall that her car would be towed from an accessible parking spot on the side of the building, though there were others in front. (Doc. 48-2 at 52-55).

The next day (October 2), HR manager Lauren Amsler called Kendall about her Process Events report. Following that conversation, on October 5, a meeting was convened among Kendall, Amsler, Young, supervisor Webster, and plant manager Dawn Pagano to discuss the status of Kendall's medical restrictions and potential accommodations. Kendall attended the meeting accompanied by her friend Evelyn Baker. During the meeting, Amsler asked Kendall to provide an updated doctor's note clarifying the nature and duration of her restrictions. According to Baker, Zoltek's representatives explained that Kendall's job restrictions and performance were not the issue, but it would be "bad for morale" if they allowed her to sit, though they acknowledged that other employees were allowed to sit. (Doc. 58-3). According to Zoltek's contemporaneous notes from the meeting, Pagano had issued a "no sitting" reminder to employees in January 2021 and explained, "we have to enforce the policy." (Doc. 58-4). Kendall confirmed in deposition that the "no sitting" rule was reiterated at pre-shift meetings. (Doc. 48-2 at 39). When Kendall asked why her accommodation was initially approved, Zoltek explained that, at that point, "sitting was secondary" (referring to Dr. Brown's first note), "not primary" with no end date. (Doc. 58-4).

Kendall went on medical leave that day and, on October 15, submitted an updated note from Dr. Brown stating "Angela needs to be able to sit down immediately after standing to change paper. She cannot crawl around on the floor. This is a permanent request starting today, October 14, 2021, thru October 14, 2022, renewable letter to be issued yearly." (Doc. 48-11). On October 26, Kendall attended a meeting with Zoltek's global manager of HR, Nan Clark, and its vice president of global HR, Gregg Biggs. They advised her to remain off work until her medical condition improved and to apply for FMLA leave and short-term disability benefits.

3

In November 2021, Kendall applied for and received both FMLA and short-term disability benefits. (Doc. 48-12; 48-14). Nurse King completed the forms and indicated that Kendall suffered from bilateral lumbar sciatica and lumbar herniation and would not be able to perform her essential job functions, particularly stooping, kneeling, bending, squatting, reaching or crawling under machines, reaching overhead, lifting over 10 pounds, or standing more than 10 minutes. (Doc. 48-12; 48-14). Other evidence in the record shows that Kendall received a series of monthly steroid injections starting November 9. (Doc. 48-21 at 3). Kendall's FMLA leave expired November 18 because she had used most of it earlier that year for a carpal tunnel surgery.

On December 1 and 6, 2021, Kendall filed charges of discrimination with the Missouri Commission on Human Rights, cross-filed with the Equal Employment Opportunity Commission, alleging disability and sex discrimination. (Doc. 48-16; 48-17). She alleged that she could perform her job with reasonable accommodations and that a male employee was permitted to sit during his shifts and was not assigned machines requiring crawling. She further alleged that Zoltek retaliated against her by eliminating her preferred accessible parking spot. In her deposition testimony, Kendall stated that the male employee, Tyrone Brooks, had never provided a doctor's note to Zoltek regarding his medical conditions, did not receive formal permission to sit during his shifts, and had received no accommodations. (Doc. 48-2 at 13-15, 60-62). Kendall submits affidavits by two other employees stating that they regularly observed some employees sitting periodically. (Doc. 58-5; 58-6). According to them, Brooks had significant limitations and sat for extended periods. In his own affidavit, Brooks stated that he had knee surgery in 2018 and a meniscus tear in 2020, each time taking leave from work but

4

returning without accommodations. (Doc. 48-23).  He denied sitting for prolonged periods and stated that he needed to stand to perform his duties.

In her MCHR charge dated December 1, 2021, Kendall states that she believes she was discharged effective October 5.  Zoltek formally terminated Kendall's employment in a letter dated January 7, 2022, recounting the foregoing events and circumstances, noting her ongoing and indefinite physical restrictions and exhaustion of FMLA leave, and citing the company's permanent staffing needs and impact on coworkers and customers.  (Doc. 48-15). The letter further states that Kendall could be rehired if released from work restrictions and would be considered for any jobs available for her qualifications.

After Kendall was terminated from Zoltek, she briefly worked for two other companies. First, she worked for a cleaning service but was fired due to her inability to mop floors.  (Doc. 48-2).   Then she worked at Tubular Steel, where she was placed on an improvement plan and quit after six weeks, in November 2022. (Doc. 48-2 at 98; 48-20). She stopped looking for work at that point and applied for Social Security Disability benefits. (Doc. 48-2 at 101).

In connection with her SSD application,  Kendall obtained an independent medical examination by Dr. David Volarich, who reported that Kendall should "avoid all bending, twisting, lifting, pushing, pulling carrying, climbing, and other similar tasks […] She should not handle weights greater than 10-12 pounds and limit this task to an occasional basis […] [and] She should avoid remaining in a fixed position for any more than 20-30 minutes at a time, including both sitting and standing." (Doc. 48-21 at 8). Kendall began receiving SSD benefits in January 2022. (Doc. 48-22).

In October 2022, Kendall filed the instant complaint alleging disability discrimination and retaliation under the Americans with Disabilities Act (Counts I and III) and sex

5

discrimination under Title VII of the Civil Rights Act of 1964 (Count II).  On Count I, she alleges that Zoltek discriminated against her for her disability by failing to provide reasonable accommodations under the ADA, specifically "(a) being allowed to sit down immediately after standing to change paper, [and] (b) not being placed on the machines that would require her to crawl on the ground to operate."  On Count II, Kendall alleges that Zoltek discriminating against her based on her sex insofar as a similarly situated male employee was allowed to work with the same accommodations she was denied.  On Count III, Kendall alleges that Zoltek retaliated against her in violation of the ADA by eliminating her preferred accessible parking spot.

After discovery, Zoltek filed the present motion for summary judgment, arguing that the facts in the record do not amount to any cognizable claim of discrimination or retaliation.  On Count I, Zoltek asserts that Kendall was not a qualified individual with a disability, as defined under the ADA, and her requested accommodation was unreasonable.  On Count II, Zoltek submits that Brooks was not similarly situated.  On Count III, Zoltek argues that it had legitimate non-discriminatory reasons for eliminating the parking space, and Kendall suffered no harm because there were other spaces available to her.  The Court has reviewed the parties' briefs, statements of fact, and accompanying exhibits.[1]

## DISCUSSION

### Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] Zoltek has also filed a motion to strike Kendall's responsive filings as untimely as a whole and improper in part, with respect to an undisclosed coworker's affidavit.  While the Court has liberal discretion whether to strike pleadings, it is an extreme and disfavored measure.  *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007).  Here, the Court's consideration of Kendall's filings does not cause any prejudice to Zoltek. The motion will be denied.

56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary are not counted. *Id*. The burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the Court considers the evidence and reasonable inferences in the light most favorable to the non-moving party. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

The non-moving party may not rely on allegations or denials but must substantiate its allegations with sufficient probative evidence that would permit a finding in its favor on more than mere speculation or conjecture. *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017). Even if some factual dispute exists, "if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party," then there is no genuine issue for trial, and the movant is entitled to summary judgment. *Id*.

### ADA Accommodation (Count I)

In Count I, Kendall pleads that she is a qualified individual with a disability under the ADA and able to complete the essential functions of her job with reasonable accommodations. She claims that Zoltek's refusal to accommodate constitutes discrimination in violation of the ADA. In support of its motion for summary judgment on this count, Zoltek asserts that Kendall is not a "qualified individual" under the ADA because her medical restrictions prevent her from performing the essential functions of the job and her proposed accommodations are unreasonable. Eighth Circuit precedent supports Zoltek's position.

To establish a prima facie case of disability discrimination, a plaintiff "must show that [s]he (1) has a disability within the meaning of the ADA, (2) is a qualified individual under the

7

ADA, and (3) suffered an adverse employment action as a result of the disability." *Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 370–71 (8th Cir. 2018) (internal citations omitted).  To be a "qualified individual" within the meaning of the ADA, an employee must (1) possess the requisite skill, education, experience, and training for her position and (2) be able to perform the essential job functions with or without reasonable accommodation.  *Id*.  In determining whether a job function is essential, the court considers the employer's judgment as to which functions are essential, written job descriptions, how much time an employee spends on the job performing the function, the consequences of not requiring the employee to perform the function, and the work of those in similar jobs.  *Goosen v. Minnesota Dep't of Transp.*, 105 F.4th 1034, 1040 (8th Cir. 2024).  The employer's judgment as to what constitutes an essential function is "highly probative." *Id*.

    *Denson* is directly on point here.  In that case, the plaintiff's job description as a fountain operator required employees to stand, bend, stretch, and walking throughout the shift, as well as to lift and carry up to thirty pounds.  *Denson*, 910 F.3d at 370.  After he fell on the job, and even after physical therapy, Denson's doctor restricted him to "no lifting more than thirty pounds; no kneeling, squatting, stooping, or climbing; and no walking or standing for more than forty-five minutes per hour." *Id*.  The employer removed him from the work schedule for a safety evaluation and later terminated him.  On review of summary judgment for the employer, the Eighth Circuit affirmed, reasoning, "Denson's permanent medical restrictions barred him from performing the duties laid out in the job description." *Id*. at 371. The ADA "does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden." *Id*.  The "employee's subjective belief that he or she can perform the essential functions of the job is irrelevant." *Id*.

8

Likewise here, Kendall's medical restrictions indefinitely prevent her from performing essential functions set forth in Zoltek's written job description for Production Operators. (48-1). Kendall admitted in deposition that, as a bath operator, she was required to lift, turn, bend, reach, pull, and walk throughout a 12-hour shift.  (Doc. 48-2 at 26-27). More specifically, the job description requires operators to be able to lift 25 pounds overhead.  But her disability application dated November 2021 indicates that she could only occasionally lift 10 pounds and never more than that, and that she could never reach above her shoulders. (Doc. 48-14). Given this evidence, Kendall's assertion that she could perform with accommodations is unpersuasive, particularly insofar as her proposed accommodations would obligate Zoltek to limit her assignments to certain machines and require other employees to frequently assist her.  Employers are not required to reallocate essential functions or cause other employees to work harder. *Goosen*, 105 F.4th at 1043.  In light of the foregoing precedent, Kendall's anecdotal testimony that other operators switched machines and sat down periodically is insufficient to create a triable fact on this issue.  *See e.g., Martin v. CalArk*, No. 4:22-CV-00722-RK, 2024 WL 1088548, at *6 (W.D. Mo. Jan. 12, 2024), *appeal dismissed*, No. 24-1519, 2024 WL 4112914 (8th Cir. Apr. 9, 2024) (where an injured truck driver argued that other drivers were allowed to receive help loading and unloading).

Zoltek's motion for summary judgment as to Count I will be granted.

**Title VII – Sex Discrimination (Count II)**

In Count II, Kendall pleads that Zoltek discriminated against her based on her sex in that a male employee, Tyrone Brooks, was permitted to sit during his shift while she was denied that accommodation.  In support of summary judgment on this count, Zoltek asserts that Brooks was not similarly situated.

Kendall's claim invokes the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The "*McDonnell Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory evidence of discriminatory intent.'" *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) (citations omitted). In a disparate treatment context, a plaintiff must show that "(1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males." *Tenge v. Phillips Mod. Ag Co.*, 446 F.3d 903, 910 (8th Cir. 2006). If a plaintiff can make out this prima facie case, the employer must then articulate a legitimate nondiscriminatory reason for its actions. *Id*. From there, the employee must demonstrate that the reason was simply a pretext for discrimination. *Id*.

Though the parties focus on whether Brooks was similarly situated, Eighth Circuit precedent instructs that an employee must first demonstrate her objective qualifications, which necessarily include the physical ability to perform the job to the employer's expectations. *Kratzer*, 398 F.3d at 1046-47. As discussed above, the medical evidence establishes that Kendall is unable to perform the essential functions of the job description. This defeats her prima facie case.

For the same reason, even accepting that Brooks was similarly situated – which the evidence does not support – Zoltek would still be entitled to summary judgment at the next burden-shifting step because Zoltek had a legitimate explanation for denying Kendall her requested accommodations. Again, an employer is not required to relieve an employee of her essential functions, *Goosen*, 105 F.4th at 1043, which in this case included standing for the better part of 12 hours, as stated in Zoltek's written job description. (Doc. 48-1).

10

Further, an adverse employment action in a Title VII case is defined as a "disadvantageous change to the compensation, terms, conditions, or privileges of employment." *Collins v. Union Pac. R.R.*, 108 F.4th 1049, 1053 (8th Cir. 2024). Zoltek's denial of what the Eighth Circuit deems an unreasonable accommodation cannot constitute a disadvantageous change in Kendall's work conditions.

Kendall cannot establish a prima facie case on her claim of sex discrimination in violation of Title VII, so Zoltek is entitled to summary judgment on Count II.

**ADA Retaliation (Count III)**

Finally in Count III, Kendall pleads that Zoltek retaliated against her for requesting accommodations by eliminating her preferred accessible parking spot on the side of the building. She claims that there was no non-retaliatory reason to do so, and Zoltek's purported reasons were merely pretextual. In support of summary judgment on this count, Zoltek argues that (1) Kendall never requested a specific parking spot, (2) Zoltek had a valid reason to eliminate her preferred spot, and (3) Kendall suffered no cognizable harm because other accessible parking spots were available to her.

To prove unlawful ADA retaliation, a plaintiff must establish that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 548 (8th Cir. 2021). "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015) (citation omitted). The adverse action "need not always involve termination or even a decrease in benefits or pay," but "not everything that makes an employee unhappy" is actionable. *Id*.

11

The entirety of the uncontroverted evidence in the record on this point is the following. In her deposition testimony, Kendall explained that she preferred to park in the only accessible spot on the side of the building, by the loading dock, because it was closer to the entrance, and HR manager Lauren Amsler said she could park there. On October 1, 2021, foreperson Williams harassed Kendall by saying she would have Kendall's car towed. Despite this alleged threat, Kendall continued to park in that same spot until she was sent home on leave four days later, and she did not know what became of the spot after that. She conceded that she was never actually forced to move to a different spot. (Doc. 48-2 at 107-110). There is no evidence that Kendall ever requested this specific spot as an accommodation, and there were other accessible spaces available to her. This record contains no evidence of discrimination or an adverse action in Kendall's employment conditions.

Though Kendall argues, without authority, that the timing of Williams' alleged threat signals discriminatory intent, the record is nonetheless wholly insufficient to create a genuine issue of material fact on this count, as no reasonable jury could find that Kendall suffered an adverse employment action.  Zoltek is entitled to summary judgment on Count III.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED**. (Doc. 46).

**IT IS FURTHER ORDERED** that Defendant's motion to strike Plaintiff's responsive filings is **DENIED**. (Doc. 63)

A separate Judgment shall issue in accordance with this Memorandum and Order.

Dated this January 27, 2025.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE